**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 17-4648**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

ANTONIO TILLMON,

        Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Elizabeth City.  Malcolm J. Howard, Senior District Judge.  (2:15-cr-00009-H-9)

Argued:  October 31, 2018               Decided:  February 26, 2019

Before NIEMEYER, AGEE and DIAZ, Circuit Judges.

Affirmed in part and vacated in part by published opinion. Judge Agee wrote the opinion, in which Judge Niemeyer and Judge Diaz joined.

**ARGUED:**  Paul K. Sun, Jr., ELLIS & WINTERS LLP, Raleigh, North Carolina, for Appellant.  Banumathi Rangarajan, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:**  Kelly Margolis Dagger, ELLIS & WINTERS LLP, Raleigh, North Carolina, for Appellant.  Robert J. Higdon, Jr., United States Attorney, Jennifer P. May-Parker, Acting First Assistant United States Attorney, Barbara D. Kocher, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

AGEE, Circuit Judge:

After being caught in a sting operation aimed at exposing corrupt law enforcement officers, Antonio Tillmon was convicted by a jury on multiple counts: conspiracy to commit drug trafficking, conspiracy to use firearms while drug trafficking, attempted possession of heroin with intent to distribute, using or carrying a firearm while drug trafficking, and three counts of federal programs bribery. On appeal, Tillmon challenges the district court's denial of his motion for a judgment of acquittal as to these offenses and its admission of a video-recorded conversation between Tillmon and an undercover agent. For the reasons discussed below, we affirm the conspiracy, attempted possession and firearms convictions, but vacate the federal programs bribery convictions.

I.

Tillmon's prosecution arose from a multi-year FBI investigation into reports of law enforcement corruption in the counties of Northampton and Halifax, North Carolina.[1] This investigation, "Operation Rockfish," began in 2013 after the FBI received information that Lann Clanton, a police officer with the Weldon, North Carolina, Police Department, was involved in criminal activity. Operation Rockfish consisted of undercover agents posing as members of a transnational drug trafficking organization ("DTO") that transported kilograms of heroin and cocaine to New York City. Part of the DTO's strategy was

---

[1] We recite the facts established at trial in the light most favorable to the Government. *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982).

"specifically tr[ying] to recruit law enforcement officers for their ability to badge their way out of legitimate traffic stops by other law enforcement officers." J.A. 406.

The FBI established a "general template" for the DTO, setting up a warehouse to prepare "cocaine" and "heroin" for shipment by storing those drugs in hidden compartments of vehicles. J.A. 412. No real drugs were used, but a lookalike substance was packaged to "look like kilograms of illegal drugs that had been seized in other investigations." J.A. 411. Ten one-kilogram packages were color-coded to identify the type of drug each package purportedly contained. Once the packages were loaded into a vehicle for transport ("the load vehicle"), team members rode in that vehicle, a scout vehicle that drove ahead of it, and a rear guard vehicle that drove behind it.

Once the ersatz DTO was operational, the FBI used a confidential informant to let Clanton know about its existence. Clanton then contacted the DTO, where his first assignment was to recruit law enforcement officers to implement the DTO's cover strategy. Clanton's first recruit was Ikeisha Jacobs, another member of the Weldon Police Department. Clanton and Jacobs then enlisted other current and former law enforcement and correctional officers to join their teams.

Jacobs recruited Tillmon, a former coworker, for her team. At the time he was recruited to the DTO, Tillmon was a police officer with the Windsor, North Carolina, Police Department. On August 19, 2014, Jacobs invited Tillmon to join her and other team members for a preparatory meeting. The gathering included Jacobs, two undercover FBI agents (John and Lisa), and four new recruits (Adrienne Moody, Alaina Sue-Kam-Lang, Crystal Pierce, and Tillmon). During the meeting, the undercover agents and Jacobs

3

described the plan for the next day's transport and explained the DTO's reason for using law enforcement officers. They gave the team members a cover story to use if police stopped them during the transport: they were transporting a vehicle that had been sold out of state. During the meeting, one undercover agent asked whether the recruits carried guns. Tillmon indicated that he would carry his gun. Toward the end of the meeting, the agents told the recruits that they did not have to participate in the operation if they wanted out.

The next morning ("the August 2014 transport"), Tillmon picked up Jacobs and Sue-Kam-Lang before driving to a prearranged rendezvous point where they met Lisa and other team members. They all then drove to a warehouse in Rocky Mount, North Carolina. Upon arrival, Tillmon helped move a large white cooler from one area of the warehouse to the back of the load vehicle, a white GMC Acadia. One of the undercover agents, Paul, pulled out ten packages from underneath the ice and drinks in the cooler, counted them, and put them on the ground. Paul handed the packages to John, another agent, who was underneath the Acadia putting the packages into a hidden compartment. Tillmon never touched the packages, but he watched as they were loaded into the compartment in plain view of him and the other team members.[2] While standing behind the vehicle, Lisa explained to Tillmon that they were "starting to move H." J.A. 591–92. Lisa testified at trial that by "H" she meant "heroin," though she did not clarify her meaning to the team members at the time.

After the packages were stored in the Acadia, it and two other vehicles caravanned to National Harbor in Maryland. Jacobs drove the load vehicle, two team members drove

---

[2] The trial evidence shows that Tillmon did not touch, handle, or assist in loading the staged packages into the vehicles during any of the events described.

the scout vehicle, and Tillmon and Sue-Kam-Lang followed as the rear guard. When they arrived at National Harbor, the team members met "Tee," another undercover agent who was posing as the supervisor of that portion of the route. Tee and the team boarded an enclosed car of a Ferris wheel, where Tee paid each member of the group. Tillmon received $2,000 and then returned to North Carolina.

In October 2014 ("the October 2014 transport"), Jacobs and Tillmon rode together to the Rocky Mount warehouse. While waiting for drugs to be loaded into the hidden compartment of the load vehicle, Tillmon was shown a fake bill of sale that would back their cover story. This time, Tillmon drove the load vehicle to the parking lot of an outlet mall in Maryland. He then got into a large van, where Tee paid him and the other team members. Tee paid Tillmon $2,000.

In March 2015 ("the March 2015 transport"), Jacobs asked Tillmon to join her a third time. When Tillmon arrived at the Rocky Mount warehouse, the agents had a pickup truck staged with packages of drugs laid out in plain view on the tailgate. The team members, including Tillmon, walked by the back of the truck as they entered the warehouse's office. Inside, Lisa asked everyone if they had guns; after Sue-Kam-Lang indicated that she did not have a gun, Tillmon gave her one of his extra guns.

The team exited the office and went back into the main part of the warehouse. As the drugs were being loaded into the hidden compartment of the vehicle, Lisa said, "you guys got to be carrying from now on . . . a million dollars of heroin, you can't f[***] around with that." Supp. J.A. 1625 at 12:47:16–47:24. She was within three feet of Tillmon as she spoke.

After the drugs were loaded, the team departed, with Tillmon and Jacobs driving the rear guard vehicle. After the team left the load vehicle at a carport in Maryland, they met Tee at the same outlet mall parking lot as in October. Each member entered Tee's vehicle separately, where they were paid. As Tillmon was paid $2,500, Tee asked him if he was carrying a gun, and Tillmon confirmed he was. Then Tee indicated he was interested in getting a small firearm. Tillmon responded, "What [do] you need?" and Tee said he wanted "a thirty-eight (.38), something small, a revolver that don't need no shells, know what I mean?" J.A. 1402. Tillmon recommended a few firearms that would meet Tee's need to "just walk right up on 'em and keep rolling" and "boom-boom and then throw that s[***] away and [not worry] about it no more." J.A. 1403–04. Tee asked Tillmon to let him know if he heard of anything available, and Tillmon replied, "Okay . . . . We'll talk." J.A. 1404. Tillmon exited Tee's vehicle and returned to North Carolina.

In April 2015, Jacobs asked Tillmon to join her again. When they arrived at the Rocky Mount warehouse, the undercover agents arrested them. At the time of his arrest, Tillmon had in his possession his badge, his Windsor police identification, four semi-automatic pistols, a .223 caliber rifle, and ammunition for each of the guns.[3]

A grand jury indicted Tillmon and fourteen others, including Clanton and Jacobs, in a fifty-four count indictment. Tillmon was charged in ten of the counts. All other defendants negotiated guilty pleas, but Tillmon pleaded not guilty and invoked his right to a jury trial on all charges: (1) one count of conspiracy to distribute and possess with intent

---

[3] These items, all of which belonged to Tillmon, were found on his person, in his bag, and in Moody's vehicle, in which he had come to the warehouse.

to distribute controlled substances, namely heroin and cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846 (Count 1); (2) one count of conspiracy to use firearms during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(o) (Count 2); (3) three counts of attempted possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(i), 846, and 18 U.S.C. § 2, corresponding to the three transports (August 2014, Count 28; October 2014, Count 33; and March 2015, Count 48); (4) two counts of use and carry of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. §§ 2, 924(c)(1)(A), corresponding to two of the transports (October 2014, Count 34; and March 2015, Count 49); and (5) three counts of federal programs bribery, in violation of 18 U.S.C. § 666(a)(1)(B), corresponding to each transport (August 2014, Count 32; October 2014, Count 36; and March 2015, Count 54).

At trial, the Government argued that Tillmon conspired with other law enforcement officers to use their badges and firearms to assist in transporting a substance they believed to be heroin out of North Carolina. Because the entire DTO was a sting operation that had been captured in video and audio recordings, the Government introduced into evidence the recordings of the preparatory meeting in August 2014 and the interactions at the Rocky Mount warehouse on each transport day.

At the close of the Government's evidence, Tillmon moved for a judgment of acquittal on all counts under Federal Rule of Criminal Procedure 29. The district court denied the motion on all but one count, granting the motion as to the charge of attempted possession with intent to distribute heroin based on the August 2014 transport. The district court reasoned that there was insufficient evidence to support the charge because it was

based solely on Lisa's reference to "H," and while she was "probably" talking about heroin, there was no evidence that anyone specifically identified the substance as heroin. J.A. 1057.

Tillmon's defense centered on his contention that he did not have the requisite intent or knowledge to commit the crimes. For example, Tillmon testified that he did not recall any discussion of his police badge or identification card at the preparatory meeting and that he did not realize he had a job during the transports or that he would be paid for that job. He further testified that he did not hear or misheard Lisa's statements at the Rocky Mount warehouse about transporting heroin. Tillmon stated that he did not have any understanding of what was happening, only that others were loading something into a vehicle to be delivered to Maryland.

During Tillmon's cross-examination, the Government introduced—over Tillmon's objection—a video recording of the conversation between Tillmon and Tee from the March 2015 transport in which Tee requested Tillmon's assistance in procuring a small-caliber firearm. Tillmon argued that the recording was unfairly prejudicial because it implicated him in uncharged violent crimes. The district court overruled the objection, concluding that any prejudicial effect was overridden by the fact that the video showed there was "a clear relationship and friendship" between Tee and Tillmon. J.A. 1001.

The jury found Tillmon guilty on the remaining nine counts. After the verdict, Tillmon renewed his motion for a judgment of acquittal, or, in the alternative, for a new trial. The district court denied the motions as to all but two counts, granting the motion for a judgment of acquittal only with respect to the attempted possession with intent to

8

distribute heroin and corresponding firearm conviction arising from the October 2014 transport (Counts 33 and 34).[4] The district court observed that sufficient evidence supported the jury's decision to convict on the conspiracy charges (Counts 1 and 2), attempted possession charge (Count 48), and firearm charge (Count 49), largely based on Lisa's reference to the "million dollars['] worth of heroin" that Tillmon received payment for accompanying to Maryland during the March 2015 transport. J.A. 1527. Further, and in relevant part, the district court concluded sufficient evidence supported the three federal programs bribery convictions (Counts 32, 36, and 54) because the record showed Tillmon and his co-defendants collectively received more than $5,000 for each transport and he was told he was transporting drugs valued at more than a million dollars.

Tillmon's sentencing was affected by two statutory mandatory minimums. Because the jury attributed at least 1 kilogram of heroin to Tillmon, the two drug offenses (Counts 1 and 32) carried a statutory mandatory minimum of 120 months' imprisonment. *See* 21 U.S.C. § 841(b)(1)(A)(i). In addition, the firearm conviction carried a mandatory minimum sentence of 60 months' imprisonment that must be served consecutively to any other sentence. 18 U.S.C. § 924(c)(1)(A) (stating that a term of imprisonment of "not less than 5

---

[4] The district court explained that the Government had not introduced evidence of Tillmon's specific intent to transport *heroin*, as the indictment charged in Count 33. Specifically, none of the recordings regarding the October 2014 transport referenced the type of drugs supposedly being transported even though they showed the staged packages being loaded into the load vehicle's fake compartment, and one of the undercover agents had testified that she thought that substance transported during this transport was supposed to be cocaine. The Government has not cross-appealed the Court's decision and thus Counts 33 and 34 are not directly at issue on appeal.

years" for the possession offense "shall" be imposed "in addition to the punishment provided for such . . . drug trafficking crime").

Although the district court calculated Tillmon's Guidelines range to be 188 to 235 months' imprisonment for all but the firearm-possession conviction, it granted Tillmon's request for a downward variance to the statutory mandatory minimums. Accordingly, the district court sentenced Tillmon to 180 months' imprisonment consisting of 120 months' imprisonment for the conspiracy, attempted possession, and federal programs bribery offenses (Counts 1, 2, 32, 36, 48, and 54), to be served concurrently, and 60 months' imprisonment for the firearm offense (Count 49), to be served consecutively to the sentence on the other counts.

Tillmon noted a timely appeal, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

II.

Tillmon appeals the denial of his renewed motion for a judgment of acquittal on all seven remaining counts. First, he argues the evidence was insufficient to show his intent to engage in the drug trafficking offenses, and that if those charges are vacated, then the firearms charges must also be vacated. Second, he contends that even if the convictions stand, the evidence was insufficient to show that the drug crimes involved more than 1 kilogram of heroin, so he should not have been subjected to an enhanced sentencing range. Third, Tillmon challenges the district court's admission of the video evidence from the March 2015 transport on the basis that it was cumulative and unfairly prejudicial. Fourth

10

and lastly, he contends the evidence was insufficient to support several elements of the federal programs bribery charges. We address each argument in turn.

The Court reviews de novo the district court's denial of a Rule 29 motion for a judgment of acquittal. *United States v. Reed*, 780 F.3d 260, 269 (4th Cir. 2015). A defendant challenging the sufficiency of the evidence "bears a heavy burden." *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997) (internal citation marks omitted). The Court reviews whether there is "substantial evidence . . . to support the jury verdict," *United States v. Samad*, 754 F.2d 1091, 1096 (4th Cir. 1984) (internal quotation marks omitted), meaning that, to reverse, the record must "demonstrate[] a lack of evidence from which a jury could find guilt beyond a reasonable doubt," *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996). Significantly, the jury—not this Court—"weighs the credibility of the evidence and resolves any conflicts in the evidence presented" when such determinations need to be made. *Id.*

The Court reviews the district court's evidentiary decisions for abuse of discretion. *United States v. Basham*, 561 F.3d 302, 325 (4th Cir. 2009). We "will not vacate a conviction unless we find that the district court judge acted arbitrarily or irrationally in admitting evidence." *Id.* at 326 (internal quotation marks omitted).

III.

A. Attempted Heroin Possession in March 2015 (Count 48)

Because our consideration of the attempted possession offense facilitates review of the conspiracy and firearms convictions, we begin with it. Tillmon argues that the

11

Government did not put forward sufficient evidence to establish the necessary mens rea to support his conviction.

It is a federal crime to "knowingly or intentionally . . . possess with intent to . . . distribute . . . a controlled substance" like heroin. 21 U.S.C. § 841(a), (b)(1)(A)(i). A conviction for an attempt to commit this offense, *see* 21 U.S.C. § 846, "punishes conduct that puts in motion events that would, from the defendant's point of view, result in the commission of a crime but for some intervening circumstance." *United States v. Pratt*, 351 F.3d 131, 135 (4th Cir. 2003). To convict Tillmon of the charged offense, the Government had to prove

> that (1) [Tillmon] had the requisite intent to commit a crime; (2) [he] undertook a direct act in a course of conduct planned to culminate in his commission of the crime; (3) the act was substantial, in that it was strongly corroborative of [his] criminal purpose; and (4) the act fell short of the commission of the intended crime due to intervening circumstances.

*Id.*

In rejecting Tillmon's renewed motion for a judgment of acquittal, the district court concluded the evidence was sufficient on each element. Specifically, it observed that Lisa pointed to the staged packages being loaded into the vehicle and said that the team was transporting a million dollars' worth of heroin. Then, Tillmon followed the load vehicle to Maryland, providing protection during the transport.

Tillmon argues that this evidence was insufficient to demonstrate that he attempted, or aided or abetted the attempt, to possess with intent to distribute heroin in March 2015. He argues that Lisa's comment about the value of the heroin does not show that he heard her statement or that he believed the group was trafficking heroin. Tillmon also argues that

12

there was no evidence that he exhibited guilty knowledge because he was not shown a substance that looked or felt like heroin, nor was there evidence that he directly handled the packages or saw their contents. Additionally, Tillmon asserts that he did not take a substantial step towards completion of the offense that strongly corroborated an intent to possess with the intent to distribute heroin. He argues that neither his presence at the warehouse nor his driving from Rocky Mount to Maryland with the team proves a specific intent to possess with the intent to distribute heroin. Consequently, Tillmon contends, the jury did not have the evidence necessary to convict him.

We disagree with Tillmon. To say that he lacked intent and was "a mere passive observer of these goings-on, would defy reason." *See United States v. McLamb*, 985 F.2d 1284, 1292 (4th Cir. 1993). At a minimum, the following evidence shows Tillmon's culpable intent: (1) he had basic law enforcement drug trafficking training; (2) the fake heroin was packaged in a manner commonly used to traffic controlled substances; (3) the staged packages were in plain view of Tillmon before and while it was secreted into a hidden compartment of the load vehicle; (4) while standing about three feet from Tillmon, Lisa pointed to the staged packages and said that the team was moving heroin valued at a million dollars; (5) two vehicles accompanied the load vehicle and each team member was paid thousands of dollars for accompanying the shipment; and (6) Tillmon not only possessed a firearm for his own use, but also loaned a team member a second firearm because they all had been instructed to carry firearms. From these facts, a jury could reasonably conclude that Tillmon had the requisite intent to attempt to possess heroin with the intent to distribute it.

13

We also reject Tillmon's contention that the evidence does not show that his conduct constituted an "attempt" to commit the completed act of possession because he did not take at least one act calculated to culminate in the completed offense. To the contrary, Tillmon completed the offense and the *only* circumstance that prevented the Government from charging Tillmon with actual possession of heroin was that the substance at issue involved fake heroin instead of real heroin. This was not a case in which some intervening act early in the planning prevented Tillmon and his co-conspirators from completing their intended activity. Rather, they successfully transported the fake substance from North Carolina to Maryland. And Tillmon willingly participated in doing so—even after Lisa commented in the warehouse that the staged packages contained heroin and Tillmon watched the team members stash the packages in the load vehicle, he took his place in the vehicle caravan, escorted the packages to Maryland, and accepted payment for his part in the scheme.

Tillmon's arguments misapply the relevant appellate standards. Some of his contentions ask the Court to assume the role of the jury and revisit credibility determinations to decide between competing evidence. However, the jury was not required to believe Tillmon's defense that he did not understand what the packages were and that he did not hear Lisa's reference to moving heroin. *E.g.*, *Burgos*, 94 F.3d at 862 ("[T]he jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." (internal quotation marks omitted)).

Some of Tillmon's arguments ask us to attach only benign, if not nonsensical, meaning to his "presence" at the warehouse and in the transport. But we have previously recognized that presence during obvious criminal activity is relevant to the analysis in a possession offense. *E.g.*, *id.* at 869 (citing *United States v. Figueroa*, 720 F.2d 1239, 1246 (11th Cir. 1983) for the proposition that "when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious[, the] knowledge of its character can fairly be attributed to him"). Here, Tillmon participated in the transport after Lisa pointed to the packages and stated that they contained a million dollars of heroin. He loaned a team member a firearm for protection during the transport and then accepted $2,500 for his "presence." Although Tillmon never touched the packages himself, his role in the transport was more than that of "a mere passive observer." *See McLamb*, 985 F.2d at 1292. And the jury was entitled to conclude that Tillmon believed the staged packages were heroin being transported for distribution, and that he possessed those packages through his role as a hired guard during the transport of those packages from North Carolina to Maryland. *See Pratt*, 351 F.3d at 136–37 (recognizing that a person's criminal role in a possession with intent to distribute offense can take various forms).

Lastly, to the extent that Tillmon argues that the district court's dismissal of the other attempted possession counts supports dismissal of this count, he ignores the specific circumstances surrounding the district court's decisions. The dismissals of the other counts were not based on a broad assessment of lack of evidence of his intent, but rather on narrow evidentiary gaps in the Government's case. All three attempted possession with intent to distribute counts alleged not just the baseline offense set out in 18 U.S.C. § 841(a)(1), but

15

also the aggravated possession with intent to distribute offense for a violation involving more than one kilogram of heroin, *see* § 841(b)(1)(A)(i). *See also United States v. Collins*, 415 F.3d 304, 312–14 (4th Cir. 2005) (discussing the difference between the baseline offense and aggravated offense); *United States v. Promise*, 255 F.3d 150, 152 (4th Cir. 2001) (en banc) (holding that, in light of *Apprendi*, § 841(b)(1)(A) sets out elements of an aggravated drug trafficking offense that must be found by a jury rather than constituting mere sentencing factors). The baseline offense does not require proof of the drug type and weight; in relevant part, it requires only that the defendant knowingly possessed a controlled substance of some kind. *United States v. Ali,* 735 F.3d 176, 186–88 (4th Cir. 2013) (holding that while 21 U.S.C. § 841(a)(1) "requires specific intent to distribute a controlled substance or to possess with intent to distribute a controlled substance, it does not require that the defendant have, within that intent, specific knowledge of the controlled substance[.]"). To convict Tillmon of the aggravated offense, however, the Government had to introduce proof that Tillmon's § 841(a)(1) violation involved at least one kilogram of heroin. *See* § 841(b)(1)(A) (stating that the enhanced penalties apply if "any person . . . violates subsection (a)" and that violation "involv[ed]" the type and quantity of drugs listed). At trial, the Government urged the district court not to dismiss the attempted possession counts relating to the August and October 2014 transports because there was sufficient evidence to convict Tillmon of the aggravated charges involving heroin. For reasons not readily apparent in the record, it did not rely on the fallback position that even if the evidence did not prove the aggravated offense elements, it was nonetheless sufficient to convict Tillmon of the attempted § 841(a)(1) baseline offense. The district court in turn

dismissed the counts based on the August 2014 and December 2014 transports because of insufficient evidence to conclude that Tillmon believed the staged packages were heroin, as opposed to some other controlled substance. By contrast, no such gap exists with respect to the March 2015 evidence. In the warehouse just prior to that transport, Lisa specifically referred to the packages as heroin while in Tillmon's immediate presence.

For these reasons, the district court did not err in denying Tillmon's renewed motion for a judgment of acquittal on Tillmon's conviction for attempted possession with intent to distribute heroin in March 2015.

### B. Drug Trafficking Conspiracy (Count 1)

Tillmon also appeals the district court's denial of his renewed motion for a judgment of acquittal with respect to his conviction for conspiracy to distribute and possess with intent to distribute controlled substances, namely heroin and cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846 (Count 1). He contends the record contains insufficient evidence of his intent.

To prove conspiracy to possess drugs with an intent to distribute, the Government must establish that: "(1) an agreement to possess cocaine [and heroin] with intent to distribute existed between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy." *Burgos*, 94 F.3d at 857. Due to the clandestine nature of a conspiracy, the offense is often proved by circumstantial evidence and the context in which the circumstantial evidence is adduced. *Id.* A conspiracy "may be inferred from a development and collocation of circumstances." *Id.* at 858 (internal quotation marks omitted). "Circumstantial evidence sufficient to

17

support a conspiracy conviction need not exclude every reasonable hypothesis of innocence, provided the summation of the evidence permits a conclusion of guilt beyond a reasonable doubt." *Id.*

The Government must establish proof of each element beyond a reasonable doubt. *Id.* And although the Government must satisfy its burden of proving a connection between the defendant and the conspiracy, it need not prove the defendant "knew the particulars of the conspiracy." *Id.* Instead, it is sufficient to show that the defendant joined "with an understanding of the unlawful nature thereof and willfully join[ed] in the plan on one occasion [even if] he played only a minor part." *Id.* (internal quotation marks omitted).

Tillmon's arguments challenging his conviction on Count 1 mirror the arguments he made regarding the attempted possession conviction. For example, he contends there was no evidence to support that he knew about an agreement to possess with the intent to distribute heroin, or that he agreed to join that endeavor. He asserts no one mentioned drug trafficking at the preparatory meeting. Further, Tillmon asserts no evidence contradicts his testimony that he did not hear Lisa's reference to heroin during the March 2015 transport. He points to the fact that he never saw a substance identified as heroin (because it was all in packages) and that he never touched the packages. And he points to his taking photographs on one of the transports as proof that he lacked a criminal mindset.

We disagree with Tillmon and do not need to add much to our preceding analysis rejecting his arguments regarding the attempted possession conviction. His arguments are grounded primarily in reweighing the credibility of witnesses and choosing between different interpretations of conflicting evidence, all of which is squarely in the province of

18

the jury and not reviewable on appeal. The rest of his arguments challenge minor details that do not affect the substantial evidence recounted above showing that he knowingly and voluntarily participated in an agreement to possess heroin and cocaine with the intent to distribute. In sum, Tillmon met with both undercover agents and co-conspirators at the preparatory meeting; observed the Rocky Mount warehouse operations on three occasions in which staged packages of heroin or cocaine were loaded into the hidden compartment of a vehicle; was trained in drug trafficking techniques; participated in the August 2014, October 2014, and March 2015 transports along with other co-conspirators; heard Lisa refer to the packages used during the March transport as "heroin"; and received $2,000 (twice) and $2,500 (once) for his services related to these transports.

To accept Tillmon's arguments, the jury would have had to believe that he—a trained law enforcement officer—did not know what was happening right in front of him. Even in cases involving defendants without Tillmon's background and training, we have recognized that jurors can find that defendants have the requisite knowledge and intent for participating in a drug trafficking offense based on their knowledge of circumstances that are "surreptitious and totally distinguishable from open and normal channels of business," such as drugs packaged for transport and stashed in a hidden compartment of a vehicle. *See Ali*, 735 F.3d at 188–89. The jury had all the more reason to find Tillmon responsible for such knowledge given his background and training. Further, the jury would have had to believe that Tillmon thought he was paid a total of $6,500 to accompany his friend Jacobs on three innocent drives to Maryland so that he could, on one occasion, take photographs of the harbor. This conclusion, too, defies common sense. The substantial evidence in the

19

record, including audio and video recordings of the events the witnesses described, supported the jury's determination of guilt.

For these reasons, the district court did not err in denying Tillmon's motion for a judgment of acquittal with respect to the drug trafficking conspiracy (Count 1).

## C. Aggravated Offense Drug Weights (Counts 1 and 48)

Tillmon argues that even if the evidence is sufficient to affirm his convictions for the drug conspiracy and attempted possession offenses, he is at least entitled to resentencing because the evidence does not support the jury's finding that his offenses involved at least one kilogram of heroin. Again, we disagree.

As noted, while the baseline 21 U.S.C. § 841 offense does not require the Government to prove the quantity of the controlled substance at issue, it does provide for increased penalties when certain threshold amounts are established. The "specific threshold drug quantities [are] treated as elements of aggravated drug trafficking offenses, rather than as mere sentencing factors" and thus must be either admitted by the defendant or found by a jury to be "reasonably foreseeable to the individual defendant." *United States v. Brooks*, 524 F.3d 549, 557–58 (4th Cir. 2008) (internal quotation marks omitted). Here, the Government had to prove beyond a reasonable doubt that Tillmon was responsible for "one (1) kilogram or more of heroin," J.A. 118, the enhanced drug quantity charged in the indictment. *See Promise*, 255 F.3d at 156–57. Only then could Tillmon be properly subjected to a mandatory minimum sentence of 10 years' imprisonment and a statutory maximum of life. 21 U.S.C. § 841(b)(1)(A)(i).

Tillmon argues that the evidence did not allow the jury to find him responsible for an offense involving at least 1 kilogram of heroin. Specifically, he asserts the record lacked evidence that agents ever told him how many kilograms they expected him to transport, that they ever mentioned the word "kilogram" or its variants, or that Tillmon knew how much heroin was in each package.

Tillmon's argument lacks merit. Trial evidence demonstrated the packages each contained roughly one kilogram of fake drugs, consistent with the way drugs are commonly packaged for distribution. *E.g.*, J.A. 544 ("Anybody who looks at one of those knows that's a brick or a kilo."). In addition, testimony established that Tillmon had been trained in drug interdiction as part of his law enforcement duties. Further, the record contained evidence that ten staged packages were positioned in plain view of Tillmon as they were loaded into the load vehicle, and each package weighed one kilogram. All told, this evidence is a sufficient basis for the jury to have found that Tillmon's drug offenses involved at least one kilogram of heroin. Therefore, the sentencing enhancement was proper and Tillmon was properly subjected to a mandatory minimum sentence of 120 months' imprisonment and a maximum term of life for his attempted possession (Count 48) and drug trafficking conspiracy (Count 1) convictions.

### D. Firearms Counts (Counts 2 and 49)

Tillmon also appeals the district court's denial of his motion for a judgment of acquittal with respect to his charges for conspiracy to use firearms during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(o) (Count 2), and use and carry of a firearm during and in relation to a drug trafficking crime (attempted possession

21

on March 2015), in violation of 18 U.S.C. §§ 2, 924(c)(1)(A) (Count 49). But Tillmon's sole argument here is that because the evidence was insufficient to support the underlying drug trafficking conspiracy (Count 1) and attempted possession with the intent to distribute heroin (Count 48) convictions, he is also entitled to a judgment of acquittal on the corresponding firearms convictions. Put another way, Tillmon does not challenge that he conspired to use or carry a firearm as part of the drug trafficking conspiracy, or that he used or carried firearms during the March 2015 transport, only that he did not commit the underlying drug offenses and so could not have committed the firearms offenses that required those predicates.

Because the evidence is sufficient to affirm Tillmon's convictions for the underlying drug trafficking offenses, Tillmon's argument fails. We therefore affirm his convictions for the firearms conspiracy (Count 2) and using or carrying a firearm (Count 49).

### E. Admission of Video Recording

Tillmon next contends that the district court committed reversible error in admitting a video recording of his conversation with Tee while he was being paid for the March 2015 transport. Specifically, Tillmon asserts that the video improperly suggested that he was complicit in plotting a murder because Tee said he wanted a firearm to kill someone.[5] On

---

[5] Tillmon also argues the evidence was needlessly cumulative and suggests the district court's decision is suspect because it had initially ruled the video inadmissible during the Government's case-in-chief. Even if the evidence was cumulative of other evidence in the record, that would not constitute reversible error on its own in this case. Rule 403 lists cumulativeness as a reason that a district court *may* decide to rule evidence inadmissible; it does not bar evidence merely because it overlaps with prior evidence. *See* Fed. R. Evid. 403.
(Continued)

that basis, Tillmon argues the recording was unfairly prejudicial and inadmissible under Federal Rule of Evidence 403.

Rule 403 states that a district "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Rule 403 is a rule of inclusion, generally favoring admissibility." *United States v. Udeozor*, 515 F.3d 260, 264–65 (4th Cir. 2008) (internal quotation marks omitted). Specifically, we have said that when considering whether evidence is unfairly prejudicial, "damage to a defendant's case is not a basis for excluding probative evidence because evidence that is highly probative invariably will be prejudicial to the defense." *Basham*, 561 F.3d at 326 (internal quotation marks omitted). Instead, "[u]nfair prejudice speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground *different from proof specific to the offense charged*." *Id.* at 327 (internal quotation marks omitted) (emphasis added).

The video evidence was highly probative of Tillmon's role in the charged conduct and it specifically rebutted Tillmon's defense that he did not understand the criminal nature

---

In addition, the record readily explains the district court's changed admissibility rulings. When the Government sought to introduce the exhibit in its case-in-chief, the court sustained Tillmon's challenge to the ability of that witness to authenticate the recording. The court's decision to sustain Tillmon's objection related solely to the foundation for its introduction, not whether the recording was admissible on other grounds. By the time the Government later attempted to introduce the recording to rebut Tillmon's defense, the foundation for its accuracy had been resolved by intervening testimony. This time, Tillmon's objection to the recording's admissibility was based on Rule 403, giving the district court its first opportunity to rule on the admissibility of the recording on that ground.

of the underlying events and that he lacked the requisite intent to engage in criminal conduct. For instance, the recording demonstrated Tillmon's admission to possessing a firearm during the March 2015 transport; his receiving $2,500 for his participation in that transport; and his familiarity and rapport with Tee, whom Tillmon believed to be part of the DTO. All of these actions are specific to the charged offenses and directly relevant to the jury's determination of Tillmon's culpability.

Nor was the video unfairly prejudicial. Tillmon and Tee's recorded conversation showed the interactions between Tillmon and another purported member of the DTO in a way that the other evidence did not. Its probative value—particularly in light of Tillmon's defense that he lacked a culpable intent to engage in drug trafficking offenses—outweighed any minimal prejudice that arose from the subject matter of their conversation. Moreover, because the jurors also knew that Tee was actually an undercover agent, they knew that his side of the conversation was role-playing rather than implicating Tillmon in any actual violent crime.

For these reasons, the district court did not abuse its discretion in admitting the video evidence.

### F. Federal Programs Bribery (Counts 32, 36, and 54)

Lastly, Tillmon appeals the district court's denial of his motion for a judgment of acquittal with respect to the three charges of federal programs bribery, in violation of 18 U.S.C. § 666(a)(1)(B) (Counts 32, 36, and 54).

In relevant part, this statute prohibits individuals who are agents of a local government agency from "accept[ing] . . . anything of value from any person, intending to

24

be influenced or rewarded in connection with any business, transaction, or series of transactions of such . . . [government agency] . . . involving any thing of value of $5,000 or more." *Id.* § 666(a)(1)(B). As a threshold to liability under this statute, the Government must demonstrate that the local government at issue "receive[d], in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." § 666(b); *see also id.* § 666(d)(5) (defining "in any one-year period").

Pointing to the amount he was paid for each individual transport, Tillmon asserts the Government failed to proffer sufficient evidence to establish that his services to the fake DTO were worth at least $5,000.[6]

We have not previously considered § 666(a)(1)(B)'s requirement that charged conduct involve "any thing of value of $5,000 or more." But the statutory language reveals that this element requires proof of the value of whatever was exchanged for the bribe. *See* § 666(a)(1)(B) (requiring that the business, transaction, or series of transactions of the government agency "involve[d] any thing of value of $5,000 or more"). This has led our sister circuits to describe the requisite proof as identifying the value of the "subject matter" of the bribe. *United States v. Robinson*, 663 F.3d 265, 271–76 (7th Cir. 2011).

The indictment charged Tillmon with accepting cash from the undercover agents posing as members of the DTO on each of the three transports, with each count corresponding to one of the transports, and it identified the subject matter of each of the

---

[6] Tillmon challenges the sufficiency of the evidence on two other elements of the offenses as well, but for the reasons discussed, we need not address those arguments.

three bribes as "protecting shipments of purported narcotics." J.A. 149, 153, 171. As we have already recounted, the record depicted what that protection entailed: Tillmon was to accompany the drugs on a journey up the East Coast, drive or ride in one of the vehicles containing or accompanying the narcotics, and recite a cover story if the caravan was stopped. And once the drugs were delivered to another member of the DTO in Maryland, he was paid—$2,000 in October 2014; $2,000 in December 2014; and $2,500 in March 2015.

Our sister circuits have recognized that one valid method of valuing an intangible, such as a service provided, is the amount of the bribe. *E.g.*, *United States v. Hardin*, 874 F.3d 672, 676 (10th Cir. 2017); *United States v. Fernandez*, 722 F.3d 1, 12–13 (1st Cir. 2013) (rejecting the value of the bribe test in favor of the value of the "transaction" test but acknowledging that the bribe amount "may be relevant [evidence] in determining the value of the bribe's objective" when "the subject matter of the bribe is a 'thing of value' without a fixed price"); *Robinson*, 663 F.3d at 271, 275 ("Without excluding other possible methods of valuation, we agree that the amount of the bribe may suffice as a proxy for value; at least it provides a floor for the valuation question."). This approach is akin to "appraising" the service as an appraiser values a tangible asset—"by looking at how much a person in the market would be willing to pay for" it. *United States v. Marmolejo*, 89 F.3d 1185, 1194 (5th Cir. 1996).

The Government properly recognizes that using the straightforward bribe-as-proxy method does not satisfy its burden in this case. The Government chose to charge Tillmon separately for each of the three transports, meaning that the Government had the burden to

26

prove that the value of his services on each of the individual transports was $5,000 or more. Under the bribe-as-proxy method, the Government's evidence is insufficient because Tillmon's aid on each transport was valued at less than $5,000 each time.

Instead, the Government advances three arguments for what other evidence could have been used to satisfy its burden: (1) that the amount of the bribes paid to the team as a whole on each transport exceeded $5,000 (the "aggregation theory"); (2) that the market value of the drugs being trafficked on each transport exceeded $5,000 (the "market value theory"); and (3) that the amount the Town of Windsor paid for public safety in each year at issue exceeded $5,000 (the "public safety theory").

Although the Government claims its aggregation theory is merely a variation on the approved bribes-as-proxy method, it is not the equivalent and we cannot use it here. The Government contends that the jury was permitted to aggregate the bribes paid to all of the team members on a particular transport to arrive at the requisite $5,000. To be sure, employing that method brings the dollar amount expended on each transport to more than $5,000. Fatally for the Government, however, the aggregation method does not arrive at an amount that reflects the statutory obligation to produce evidence of the value of the subject matter of the bribe charged in the indictment—that is, *Tillmon's* "protecting shipments of purported narcotics." J.A. 149, 153, 171. The aggregation method conflates the value of *Tillmon's* services to the DTO with the value of the *team's* services to the DTO. The record does not permit the conclusion that Tillmon single-handedly provided services equal to the amount paid to the team as a whole. And without such evidence demonstrating that Tillmon's services were worth that amount, the aggregation method is not an acceptable

27

valuation method. For these reasons, we reject the aggregation method as an appropriate valuation method in this case.

The Government's proposed market value theory fares no better. As our sister circuits have recognized, in some instances, it may be appropriate to look at the market value of the bribe from the perspective of the briber or an interested third party as a means of valuing the subject matter of the bribe. *E.g.*, *Fernandez*, 722 F.3d at 15 (approving valuation method for votes related to pending legislation by looking to the briber's expected financial gain flowing from the passage of that legislation); *United States v. Curescu*, 674 F.3d 735, 738, 741 (7th Cir. 2012) (approving valuation of a bribe given to falsely certify that plumbing had been completed by a licensed plumber based on the amount of money the briber did not have to pay a licensed plumber to perform the work); *United States v. Hines*, 541 F.3d 833, 837 (8th Cir. 2008) (using market value theory to value expedited eviction orders based on the savings to the property owners in avoiding the costs typically incurred in eviction). But even then, in addition to evidence of something having value to the briber or a third party, the Government also must come forward with evidence "linking" that valued item to the services the defendant provided. *See United States v. Owens*, 697 F.3d 657, 661 (7th Cir. 2012). To reiterate, the Government's evidence must bear on the value of the subject matter of the bribe, and that obligation is not satisfied with evidence of something "to which the subject matter of the bribe is tangentially related." *Id.*

In this case, the Government pointed to something of purported value to the briber— the market value of the narcotics—but it failed to put forward any evidence linking that

28

value to Tillmon's protection of the caravan, the subject matter of the bribe. Specifically, the Government relies on Lisa's statement during the March 2015 transport that the team was shipping a million dollars of heroin and argues that because Tillmon was hired to protect a million-dollar transport on that occasion and to protect similar package quantities during the other two transports, his services on each transport were worth a million dollars. The Government then contends that the Court can infer from the evidence that the other transports involved similar drug packages and that they also thereby satisfied the $5,000 requirement. That reasoning is flawed because no evidence in the record links the purported value of the drugs to the value of Tillmon's protection services. As the record stands, the two are merely tangentially related. The Government could have attempted to provide evidence sufficient to create the necessary linkage in several ways. For example, it could have offered evidence that trafficking organizations typically provide protection with a cut of the profits from eventual sales. Or it could have offered evidence that the cost of legitimate protection for drug transports involving that amount of drugs costs real DTOs $5,000 or more. But the Government offered no such evidence. In fact, it failed to introduce *any* evidence allowing the inference that the value of Tillmon's services was connected to the value of the drugs. Thus, the Government's market value theory lacks any evidentiary basis.

The Government's third argument, the public safety theory of valuation, can be disposed of quickly. For the first and only time in this appeal, the Government mentions in a single sentence of its Response Brief that the $5,000 value of Tillmon's services could be measured based on the Town of Windsor's annual public safety budget. Setting aside

29

any concerns regarding the timeliness and adequacy of the Government's argument, we observe that Windsor's entire public safety budget is unrelated to and would vastly overstate the value of Tillmon's services to the DTO. As such, it would be an improper measure of the subject matter of the bribe.

In sum, the Government failed to produce evidence from which a jury could find that Tillmon's services to the DTO had a value of $5,000 or more. Though the Government might have satisfied this requirement in several ways, it failed to introduce any evidence other than the amount Tillmon was paid as a bribe to establish that the value of his protection services were worth at least $5,000. And in the absence of evidence to support that element of the offense, Tillmon's convictions for federal programs bribery, Counts 32, 36, and 54, cannot stand and we vacate each of these convictions.

IV. Conclusion

For the reasons explained above, we affirm Tillmon's convictions on the drug trafficking and firearms offenses (Counts 1, 2, 48, and 49), but we vacate Tillmon's convictions for federal programs bribery (Counts 32, 36, and 54).

As the parties agree, the record shows that Tillmon's sentence cannot be affected by the vacation of his federal programs bribery convictions. After calculating Tillmon's Guidelines range, the district court imposed a downward variant sentence of 180 months' imprisonment—120 months to run concurrently on Counts 1, 2, 48, 32, 36, and 54; and 60 months to run consecutively on Count 49. Vacating Tillmon's federal programs bribery convictions does not change his sentence, which is still 120 months' imprisonment for

30

Counts 1, 2, and 48, to run concurrently with each other, and 60 months' mandatory minimum imprisonment for Count 49, to run consecutively to the others. Because 120 months is the statutory mandatory minimum sentence for the drug trafficking conspiracy (Count 1) and attempted possession (Count 48) convictions, Tillmon *cannot* be sentenced to a lower term of imprisonment on the part of the sentence that was running concurrently with his sentence for the now-vacated federal programs bribery convictions. Similarly, Tillmon's consecutive sentence for Count 49 must continue to run consecutively to the other term of imprisonment. As such, we need not remand for resentencing.

*AFFIRMED IN PART*
*AND VACATED IN PART*